United States Courts
Southern District of Texas
FILED

JUL 2 2 2016

David J. Bradley, Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

**LUUL YIKALO TIKABO,** an Individual,
**SELAM GROCERY,**
A Sole Proprietorship,
      **Plaintiffs,**
v.

**UNITED STATES OF AMERICA,**
      **Defendant.**

Civil Action No. *16 - 2197*

## COMPLAINT

The Plaintiffs, LUUL YIKALO TIKABO and SELAM FOOD STORE, by and through their undersigned counsel and hereby sue the UNITED STATES OF AMERICA upon the grounds set forth herein, and in support thereof, states as follows:

### FACTUAL BACKGROUND

1.  The Plaintiff own and operate a small retail store in Houston, Texas, named Selam Grocery.  The store, which has been a neighborhood staple since May of 2011, functions as a small grocery store for local residents, and is comprised of a commercial storefront approximately 297 square feet in size, the vast majority of which is dedicated to retail sales of international food products.  Though the store itself is physically small, it specializes in serving the grocery needs of ethnic people from the Eritrean and Ethiopian areas of Africa, including: Eritrea, Ethiopia, Somalia, Djibouti, Yemen and Sudan (hereinafter "**Selam**").

2.  Located in Texas' 18th Congressional District, Selam serves a community where an estimated 40.7% of the local residents are below the poverty level[1]. Roughly eighty-seven percent (87%) of the households in the 18th Congressional District are

---

[1] According to the United States Census Bureau's Fact Finder, American Community Survey 5-Year Estimates, 2014

participants in the Supplemental Nutrition Assistance Program[2], formerly known as Food Stamps, which is overseen by the Food & Nutrition Service ("FNS") of the United States Department of Agriculture ("USDA").

3.  Accordingly, Selam began accepting Electronic Benefit Transfers (or "EBT") in 2011 to better serve the local community. As a result, Selam grew its SNAP participant customer base to a substantial share of the store's total clientele. EBT transactions at Selam accounted for a substantial portion of the store's gross revenue, though the SNAP clientele accounted for an even larger portion of the gross revenue (the difference being found in non-SNAP related purchases).

4.  Since the store began accepting food stamps/EBT, Selam has never once received a warning letter, disciplinary action, or any other correspondence from the United States Department of Agriculture which would indicate that the store was somehow improperly accepting benefits or otherwise operating the program incorrectly.

5.  Nevertheless, on January 14, 2016, the USDA, through the FNS, sent the Plaintiffs a Charging Letter pursuant to 7 C.F.R. §278.6, alleging a series of violations on the part of the Plaintiffs in their acceptance of SNAP benefits from participants.

6.  The Plaintiffs vehemently denied and defended against the Charging Letter, but on June 22, 2016, were permanently disqualified from SNAP.

7.  As a result, the store lost the vast majority of its gross revenue (including revenue derived from SNAP) and along therewith, a substantial portion of the store's clientele.

8.  Accordingly, the Plaintiffs filed an Administrative Review as permitted by 7 C.F.R. §279, and presented arguments and evidence in support of their position. The Plaintiffs took issue not only with the disqualification process, but also with the

[2] See USDA Publication of March 2015, Profile of SNAP Households: Texas Congressional District 18.

comparative lack of direct evidence that any violations of SNAP retailer policies had occurred.

9.  The Administrative Review Division of the USDA responded to the Plaintiffs' appeal in a letter and opinion dated June 17, 2016 and received on June 22, 2016. The Plaintiffs' appeal was denied. A copy of the letter and opinion dated June 17, 2016 are attached hereto as **Exhibit "A"**.

10. This Judicial Appeal has been filed, timely, to seek the reversal of the USDA's current decision to permanently disqualify the Plaintiffs from participating as a SNAP retailer.

## JURISDICTION AND VENUE

11. The Plaintiffs bring this action based upon their disqualification from eligibility to participate in the Supplemental Nutrition Assistance Program, as codified by Congress in 7 U.S.C. §§ 2011 – 2036(c).

12. This Court has subject matter jurisdiction over the matters raised by the Plaintiffs in this case pursuant to 7 U.S.C. §2023, and 7 C.F.R. §279.7. Furthermore, 28 U.S.C. §1331 gives this Court original jurisdiction over civil actions arising under the laws of the United States, for which the aforementioned statute and regulation qualify.

13. Venue is appropriate in this District pursuant to 7 C.F.R.§279.7(a), 7 U.S.C. §2023(13) and 28 U.S.C. §1391(b) as this Plaintiffs' business was owned and operated in Houston, Texas, and because the facts giving rise the circumstances herein occurred in the Southern District of Texas.

## PARTIES

14. The Plaintiff, LUUL YIKALO TIKABO, is a natural person and a resident of Houston, Texas, and is the owner of Selam Food Store. Ms. Tikabo is referred to collectively with the other Plaintiffs as "**Selam**" herein.

15. The Plaintiff, SELAM GROCERY, is a Texas sole proprietorship operating at 6440 Hillcroft Street, Suite 110, Houston, Texas 77081-3104. Selam Grocery is referred to herein with the other Plaintiffs collectively as "**Selam**."

16. The Defendant, the UNITED STATES OF AMERICA, acting through its agency, the United States Department of Agriculture (hereinafter referred to as the "USDA" or "Department"), and its subservice, the Food and Nutrition Service.

## GENERAL ALLEGATIONS

17. The Supplemental Nutrition Assistance Program (SNAP) is a government program operated pursuant to Title 7 United States Code, Chapter 51, and codified more specifically as 7 U.S.C. §§2011-2036(c).

18. The general purpose of the SNAP is to provide food benefits (formerly "food stamps") to program participants who meet certain financial need requirements. SNAP participants are awarded benefits (money) issued on a state-by-state basis in varying amounts based upon the needs of their household. These benefits are transmitted to, and utilized by the participant, through an Electronic Benefits Transfer (EBT) card, which conceptually functions similar to a debit card.

19. The benefits are to be used by the participant only for the purchase of food and other eligible items sold by approved SNAP retailer, such as Selam.

20. In turn, SNAP retailers are governed by the Defendant through 7 C.F.R. §278.6 which in pertinent part permits the disqualification or suspension of retailers who violate SNAP regulations.

21. Significantly, SNAP violations on the part of retailers typically occur in two areas: (1) the sale of ineligible items to SNAP participants (using their EBT benefits), and (2) trafficking in SNAP benefits.

22. The term "trafficking" is defined at length by 7 C.F.R. §271.2, which states in pertinent part that trafficking is:

> "(1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone;
>
> (2) The exchange of firearms, ammunition, explosives, or controlled substances, as defined in section 802 of title 21, United States Code, for SNAP benefits;
>
> (3) Purchasing a product with SNAP benefits that has a container requiring a return deposit with the intent of obtaining cash by discarding the product and returning the container for the deposit amount, intentionally discarding the product, and intentionally returning the container for the deposit amount;
>
> (4) Purchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product, and subsequently intentionally reselling the product purchased with SNAP benefits in exchange for cash or consideration other than eligible food; or
>
> (5) Intentionally purchasing products originally purchased with SNAP benefits in exchange for cash or consideration other than eligible food;
>
> (6) Attempting to buy, sell, steal, or otherwise affect an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification

numbers (PINs), or by manual voucher and signatures, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone." 7 C.F.R. §271.2 (2016)

23. While most of 7 C.F.R. §278.6 sets forth a graduated scale for punishment of SNAP retailers for the sale of ineligible items, trafficking is treated more harshly. Specifically, if a retailer is found to be trafficking in SNAP benefits, it (more specifically, the individual(s) who has applied for SNAP participation) is permanently disqualified from participation in the program, and issued a Civil Money Penalty (CMP) of no more than $59,000.00.

24. The CMP itself is not immediately assessed against the retailer, but instead is held in abeyance until the retail store is sold (regardless of the period of time intervening between the permanent disqualification and the sale), and then assed against the individual(s) who were the applicants on behalf of the store.

25. Such are the circumstances of this case. The Plaintiffs have been permanently disqualified by the Defendant, resulting in damage to the Plaintiffs, and a potential future fine.

## COUNT I: REQUEST FOR JUDICIAL REVIEW

26. The Plaintiffs incorporate and restate each and every paragraph set forth above as though fully set forth herein.

27. The Plaintiffs, pursuant to 7 U.S.C. §2023 and 7 C.F.R. §279.7 have the right to, and hereby do, request a judicial review of the permanent disqualification issued by the Defendant against Selam and its proprietor.

28. The initial administrative decision, in addition to the Final Agency Decision rendered upon the Administrative Appeal, errantly found that the Plaintiffs had committed

trafficking as a result of its use of an algorithm/computer program which arbitrarily determined that the Plaintiffs' EBT transactions were inherently suspicious.

29. However, at a minimum the preponderance of the evidence indicated that the algorithm/computer program failed to take into account the business practices of Selam, and the pricing structure maintained by the store for SNAP eligible items, and the specialized clientele who shop at the store.

30. As a result, the Defendant relied solely on assumptions resulting from the data in its possession, and summarily disregarded the plausible and likely explanations provided by the Plaintiffs.

31. As such, the Defendant, acting through its department and sub-departments in the USDA, improperly and impermissibly permanently disqualified the Plaintiff from participation in SNAP.

32. Therefore, the permanent disqualification against the Plaintiffs should be set aside by this Court and the Plaintiffs' status as an approved SNAP retailer should be reinstated.

**WHEREFORE**, the Plaintiffs, LUUL YIKALO TIKABO and SELAM FOOD STORE, respectfully request this Honorable Court conduct a Judicial Review of the Defendant's permanent disqualification of the Plaintiffs, and subsequently enter Judgment against the Defendant for improperly permanently disqualifying the Plaintiffs, as well as awarding the Plaintiffs the costs incurred in this action.

## COUNT II: VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS

33. The Plaintiffs hereby incorporate and restate each of the above paragraphs as if fully set forth herein, though specifically exclude any aforementioned prayer for relief, limiting such incorporation only to the allegation of facts.

34. The Plaintiffs are entitled to Due Process as assured by the 4th Amendment to the United States Constitution as Administrative Proceedings before the Defendant involve significant financial and economic consequences. See generally *Cross v. U.S.*, 512 F.2d 1212 (1975, CA4 SC).

35. The application of the statutes, rules, and regulations set forth above on the part of the USDA has been arbitrary and capricious in this case.

36. The Defendant's conclusions and determinations of what amounts to "trafficking" is evidentiarily arbitrary in nature, and lack any support from the rules, regulations or code that has been set forth.

37. Specifically, the Department's utilization of a computer algorithm/program which plucks data points from a six month or greater time period, and subsequent use of such data points as justification to infer the existence of trafficking where other explanations are equally or more likely[3], deprives the Plaintiffs, and others like them, of the protections and process set forth so specifically in the CFR and the USC.

38. In fact, the Department has seemingly wholeheartedly forgotten the entire remainder of §278.6 in favor of labeling every *potential* violation as "trafficking" without so much as a reasonable evaluation by a department member as to the possibility of other explanations.

39. The Department has abandoned the concept of warning letters or other less severe attempts to curb violations in favor of a one-strike, you're out policy.

---

[3] The algorithm/program utilized by the Defendant fails to account for different business practices and circumstances unique to stores that cannot be compared even locally to the stores around them.

40. The Code and Regulations governing this area of the law are clearly in place to provide a graduated schedule of punishments and sanctions for a graduated level of violations rather.

41. The Defendant's utter failure to utilize any other part of the Code or Regulations in punishing the Plaintiffs serves to demonstrate that the code and regulations remain in name only, while the practice has become far more draconian.

42. Furthermore, while the Plaintiffs have been permitted to present evidence to the Defendant during the administrative process, the Plaintiffs have not been afforded the opportunity to evaluate and respond to all of the evidence against them.

43. While several courts have held over the past thirty years that the Plaintiffs are afforded Due Process during the administrative portions of SNAP disqualification or suspension proceedings because they have an opportunity to submit evidence to the Defendant, the administrative process is still woefully lacking in substantive due process.

44. Specifically, the Plaintiffs were not afforded the opportunity to view the evidence against them in order to fully respond to the Defendant's charging letter, or to adequately present their case in an administrative appeal.  Instead, the Plaintiffs were provided only a list of transactions (including date, amount and time information), but were not afforded identification of the alleged participant/household that made the purchase, nor are the Plaintiffs presented with the opportunity to evaluate the factors taken into consideration by the program/algorithm in determining whether or not the transactions are inherently suspicious.

45. The result is a Kafka-esque trial where SNAP retailers are unaware of the nature and extent of the allegations they've been charged with, nor do they have a full disclosure of evidence presented against them. Instead, they are thrust into a system that has unreasonably short response deadlines (10 days), with confusing allegations and seemingly arbitrary evidence to combat it. In the meantime, the Defendant is afforded months (if not years) to collect data and evidence that it intends to use against the SNAP retailer.

46. Thus, the Plaintiffs have been afforded a mere token of participation in the process, but are substantively denied the opportunity to meaningfully address the allegations and evidence brought against them.

47. Therefore, the Defendant has not only arbitrarily and capriciously enforced 7 U.S.C. §2021 and 7 C.F.R. §278.6, but also denied Substantive Due Process to the Plaintiffs by issuing a permanent disqualification without a meaningful opportunity to be made fully aware of the charges & evidence against them, effectively denying them the ability to respond to the charges.

**WHEREFORE**, the Plaintiffs, LUUL YIKALO TIKABO and SELAM FOOD STORE, respectfully request this Honorable Court conduct a Judicial Review of the Defendant's permanent disqualification of the Plaintiffs, and subsequently enter Judgment against the Defendant for improperly permanently disqualifying the Plaintiffs, as well as awarding the Plaintiffs the costs incurred in this action.

This matter has been respectfully submitted to the Court by the undersigned attorney, and shall be served upon the Defendant in the manner prescribed by the Federal Rules of Civil

Procedure, 7 C.F.R. §279 and 7 U.S.C. §2023, as will be evidenced by the proof of service filed with the Court hereafter.

**ANDREW L. TAPP, ESQ.**
Florida Bar No.: 68002
Brandon Legal Group, PLLC
100 S. Ashley Drive, Suite 1780
Tampa, Florida 33602
(813) 228-0658
Service@BrandonLegalGroup.com
Andy.Tapp@BrandonLegalGroup.com
LaJeana.Deane@BrandonLegalGroup.com

EXHIBIT "A"

**United States
Department of
Agriculture**

Food and
Nutrition
Service

Retailer Policy and
Management
Division

Administrative
Review Branch

3101 Park Center
Drive, 4ᵗʰ Floor
Alexandria, VA
22302

Phone:
(978) 314-0046

Fax:
(844) 629-1722

MaryKate.
Karagiorgos
@fns.usda.gov

# USDA

June 17, 2016

Andrew Z. Tapp, Attorney
Brandon Legal Group
100 S. Ashley Drive
Suite 1780
Tampa, FL 33901

Re:   Case #C0186623
      Luul Yikalo Tikabo, Owner
      Selam Grocery
      6440 Hillcroft Street
      Suite 110
      Houston, TX 77081-3104

Dear Counselor:

Enclosed is the Final Agency Decision of the U.S. Department of Agriculture (USDA),
Food and Nutrition Service (FNS), in response to your request for administrative review
postmarked March 7, 2016.  Included therein is also a statement regarding relevant rights to a
judicial review.

It is the decision of the USDA that there is sufficient evidence to support a finding that a
permanent disqualification from participating as an authorized retailer in the
Supplemental Nutrition Assistance Program (SNAP) was properly imposed against
Selam Grocery by the Retailer Operations Division.

Sincerely,

Mary Kate Karagiorgos
Administrative Review Officer

Enclosure – Final Agency Decision

cc:    Luul Yikalo Tikabo

**U.S. Department of Agriculture**
**Food and Nutrition Service**
**Administrative Review Branch**
**Alexandria, VA  22302**

| | |
|---|---|
| Selam Grocery, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | )          **Case Number: C0186623** |
| | ) |
| Retailer Operations Division, | ) |
| | ) |
| Respondent. | ) |
| ———————————————— | ) |

## FINAL AGENCY DECISION

It is the decision of the USDA that there is sufficient evidence to support a finding that the permanent disqualification of Selam Grocery (hereinafter Selam or Appellant) from participation as an authorized retailer in the Supplemental Nutrition Assistance Program, as initially imposed by the Retailer Operations Division was appropriate.

## ISSUE

The issue accepted for review is whether the Retailer Operations Division took appropriate action, consistent with 7 CFR §278.6(a), (c) and (e)(1) in its administration of the SNAP, when it assessed a permanent disqualification against Appellant.

## AUTHORITY

7 USC §2023 and the implementing regulations at 7 CFR §279.1 provide that "A food retailer or wholesale food concern aggrieved by administrative action under §278.1, §278.6 or §278.7 ... may file a written request for review of the administrative action with FNS."

## STATEMENT OF THE CASE

In a letter dated January 14, 2016, the Retailer Operations Division charged Appellant with trafficking, as defined in Section 271.2 of the SNAP regulations, based on a series of irregular SNAP transaction patterns that occurred during the months of September 2015 through November 2015.  The letter noted that the penalty for trafficking is permanent disqualification as provided by 7 CFR §278.6(e)(1).  The letter also noted that Appellant could request a trafficking civil money penalty (CMP) in lieu of a permanent disqualification within ten days of receipt under the conditions specified in 7 CFR §278.6(i).  Appellant replied to the charge letter by letter dated

1

January 20, 2016. Appellant denied trafficking and stated that the transaction patterns were based on the sale of some unique ethnic products. Appellant did not request a CMP.

After considering Appellant's reply and the evidence presented in the case, the Retailer Operations Division issued a determination letter dated March 2, 2016. The determination letter informed Appellant that it was permanently disqualified from the SNAP in accordance with 7 CFR §278.6(c) and §278.6(e)(1). The determination letter also stated that Appellant was not eligible for a trafficking CMP because Appellant failed to submit sufficient evidence to demonstrate that the firm had established and implemented an effective compliance policy and program to prevent violations of the SNAP.

In a letter postmarked March 7, 2016, Appellant, through counsel, appealed the Retailer Operations Division's determination and requested an administrative review. The review request was granted.

## ANALYSIS AND FINDINGS

In administrative proceedings involving disputes of regulatory actions or inactions, the USDA assumes the responsibility of establishing a sufficient factual record to prove or disprove the allegations of the appeal. The record is then reviewed in light of the evidentiary standards and analytical frameworks established by various courts of law.

In appeals of adverse actions, the Appellant bears the burden of proving by a clear preponderance of the evidence, that the administrative actions should be reversed. That means the Appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a whole, might accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

### I

The controlling statute in this matter is contained in the Food and Nutrition Act of 2008, as amended, 7 USC §2021 and §278 of Title 7 of the Code of Federal Regulations (CFR). Part 278.6(a), (c) and (e)(1) establish the authority upon which a permanent disqualification may be imposed against a retail food store or wholesale food concern in the event that personnel of the firm have engaged in trafficking SNAP benefits.

7 CFR §271.2 states, in part, that, "Eligible foods means: Any food or food product intended for human consumption except alcoholic beverages, tobacco and hot food and hot food products prepared for immediate consumption."

7 CFR §271.2 defines trafficking as: "(1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone; . . ."

7 CFR §278.6(a) states, inter alia, that "FNS may disqualify any authorized retail food store . . . if the firm fails to comply with the Food and Nutrition Act of 2008, as amended, or this part. Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an *electronic benefit transfer system*, . . ." (emphasis added)

7 CFR §278.6(b)(2)(ii) states, inter alia: "Firms that request consideration of a civil money penalty in lieu of a permanent disqualification for trafficking shall have the opportunity to submit to FNS information and evidence . . . that establishes the firm's eligibility for a civil money penalty in lieu of a permanent disqualification in accordance with the criteria included in §278.6(i). This information and evidence shall be submitted within 10 days, as specified in §278.6(b)(1)."

7 CFR §278.6(e)(1) reads, in part, "FNS shall disqualify a firm permanently if personnel of the firm have trafficked as defined in §271.2."

7 CFR §278.6(i) states, inter alia: "FNS may impose a civil money penalty in lieu of a permanent disqualification for trafficking . . . if the firm timely submits to FNS substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent violations of the Program."

## II

In the administrative review request received March 10, 2016, and subsequent correspondence dated April 14, 2016, Appellant, through counsel, stated the following summarized contentions, in relevant part:

- Appellant specializes in serving the grocery needs of people from areas of Africa, including: Eritrea, Ethiopia, Somalia, Djibouti, Yemen, and Sudan.
- The foods sold are not readily available in the United States or easy to come by in Houston.
- Many of the ingredients sold by the store are the primary staple foods for Ethiopians, as well as serving significant roles in their New Year celebrations and other holidays.
- Some of Appellant's ingredients include: tumerica powder by the pound, red food ball lentil (2lb or 4lb bags), kalongi seeds, nutmeg powder, methi powder (fenugreck), mango juice, ivory teff flour, masoor dak (4lbs bags), hesh mehndi powder, chakki fresh atta (4lb or 10lb bag), brown teff flour, guava juice, brown lentil massor (2lb bag), and hesh powder.
- Most of the foods come in cases or large bags by the pound and are purchased as such.
- Appellant's other specialty food is Injera, which is sourdough-risen flatbread that has a unique, slightly spongy texture and is traditionally made out of flour.
- Appellant's customers purchase a tremendous amount of Teff and Taff.
- Appellant's customers have a habit of purchasing all of the store's stock upon arrival at the store to ensure they will not run short of their supply for cooking.
- Examples of food sold by Appellant include: Teff 25 lbs bag- $60.00; barley 25 lbs bag - $25.00; sorghum 25 lb bag - $30.00; shiro 1 lb bag - $15.00; eggs; milk; cereal; noodles; Berbera 1b - $15.00; imported juices 24 - $12.00; lentils 4 lb - $6.50; lentils 2 lb - $3.25; Ethiopian tea; mitmita; noodles; rice; and other food items.
- Each employee has been trained to implement the SNAP program and accept EBT payments

3

since the store started accepting EBT payments.
- The training included a disclosure of the store's policy regarding violations of the EBT regulations, and a complete guide for what transactions were permissible, what items were eligible, and how and when payments could be accepted.
- Appellant's geographic area has approximately a 40.7% poverty rate.
- The vast majority of the poor is located in the geographic area immediately surrounding the store.
- Texas' 18th Congressional District, where Appellant is located has approximately 87.1% of the local population receives SNAP benefits, with 225 of which are households with one or more people who are 60 years or older and 65.1% with children under the age of 18.
- The store's customers conform to some of the traditional transaction patterns for SNAP participants in that they make large and frequent purchases within a week of receiving their benefits, and frequently within the first 48 hours.
- A noted in the Analysis of EBT Redemption Patterns:  Methods and Detailed Tables (issued February 2011 by the USDA), the local SNAP participants expend more than half of their benefits within seven days of receiving their benefits and a large portion of households redeem nearly all of their benefits in the first two weeks of the month.
- Neither of the transaction categories are demonstrative of any level of violation on the part of Appellant but are the necessary and logical conclusions to the inventory and customer base that the store serves.
- Prices end in round numbered cents because that is how the store's large items are priced.
- The transactions are large because the store buys in bulk and sells to its customers in bulk.
- Transactions ending in a same cents value:
  o Appellant's store is run using a variety of even-cents pricing of food and grocery items.
  o Only 25 of the transactions listed exceed $61.00.
  o These transaction amounts remain in the realm of average EBT purchases as defined by the Benefits Redemptions Patterns set forth in Exhibit D, which lists the average EBT purchase to be $29.48.
  o The Department has no evidence to refute Appellant's position regarding the pricing if the individual items in the store, and as such, should take Appellant's representation as undisputed.
  o There are no local stores that sell the same items as Appellant nor are there stores that sell to this customer base in such a significant volume.
  o The Department cannot present evidence as to the inventory of other stores that are similarly situated because there are none.
- Excessively large purchases
  o The largest transaction listed is $300.00 and this is not inherently excessive given the grocery and the nature of New Year celebrations which occur in September for Ethiopia, nor could it be viewed as excessive for the store's type of goods and clientele.
  o The higher dollar purchases invariably include the purchase of Teff.
  o Receipts for large purchase transactions paid with cash are provided in the amounts of $300.00 and $600.00.
  o Given the variety of amounts and total number of transactions indicated in Attachment 2, it would appear that the Department's algorithm simply tagged every single transaction that the store conducted from September 2015 to November 2015.
  o There's no specific evidence that any of these transactions are inherently indicative of

4

trafficking or that the Appellant has somehow rigged the transactions to be in an amount higher than they otherwise should be.
- o   The well diversified scope of the transaction amounts indicate a wide variety of different purchases that have occurred through the ordinary course of offering good products and services as a specialty small grocer.
- o   Households acted in accordance with the patterns discussed and simply made large purchases of ethnic food early in the month, shortly after the issuance of their benefits.
- o   Appellant should be categorized as a specialty food store and not a small grocer.
- o   Small grocers typically do not have the assortment of international products that Appellant has nor do they traditionally serve a large portion of their clients with these bulk specialty foods that the store presently offers.
- There is not a store in Appellant's geographic area that could possibly function as a baseline for comparison purposes.
- As noted by the Western District Federal Court for New York in the case Brooklyn Mini Market vs. U.S. Case No. 12-CV-6708T (2014), where the Department lacks local comparisons to the store it alleges has committed trafficking, its evidence is insufficient to amount to trafficking as the basis for the comparative data does not exist.
- The absence of transactions occurring too close together or that the households benefits were drained indicate that the transactions occurring at the location are legitimate in nature and do not amount to trafficking.

In support of its contentions, Appellant, through counsel, submitted the following documents:

- Exhibit A: four invoices of product purchased;
- Exhibit B: four photographs of food stock;
- Exhibit C: Pages xxvii and xxviii from the February 2011 the Office of Research and Analysis Benefit Redemption Patterns in the Supplemental Nutrition Assistance Program Final Report;
- Exhibit D: Page xxviii and xxxi from the same report referenced in Exhibit C;
- Exhibit E: Five receipts for large transactions paid in cash; and
- Exhibit F: Three page report on Poverty Status in the past 12 months from American Factfinder; five page report titled Community Fact for Zip Code 77081 from American Factfinder; March 2015 Profile of SNAP Households Report for Texas Congressional District 18.

The preceding may represent only a brief summary of the Appellant's contentions presented in this matter. However, in reaching a decision, full attention and consideration has been given to all contentions presented, including any not specifically recapitulated or specifically referenced herein.

## III

The Appellant firm was charged and determined to be trafficking based on an analysis of EBT transaction data from September 2015 through November 2015. This involved the following SNAP transaction patterns which are indicative of trafficking:

- There were an unusual number of transactions ending in a same cents value.
- Excessively large purchase transactions were made from recipient accounts.

The issue in this review is whether, through a preponderance of evidence, it is more likely true than not true that the questionable transactions were the result of trafficking.

FNS authorized Selam as a combination grocery/other (CO) store on May 3, 2011. The case file indicates that in reaching a disqualification determination, the Retailer Operations Division considered information obtained during a November 15, 2015, store visit conducted by a FNS contractor to observe the nature and scope of the firm's operation, stock and facilities. This information was then used to ascertain if there were justifiable explanations for the firm's irregular SNAP transactions. The store visit report and photographs documented the following store size, description, and characteristics:

- Selam is approximately 128 square feet, with no additional food storage outside of public view.
- There were no shopping carts or shopping baskets for customer use.
- There was one cash register and one point-of-sale device.
- There was no optical scanner for speedy processing of transactions.
- The checkout area is undefined with no counter to place goods on when checking out.
- There was some specialty ethic foods including bread, flour, and spices for sale.
- There was no fresh, frozen, or canned meat, poultry, or fish.
- There was limited dairy including eight individual chocolate milk containers and two pounds of butter.
- The only fresh produce was bananas.
- The inventory of other staple foods at the time of the visit was very limited and included bread, beans, pasta, juice, snacks (individual serving size), and some canned tomato sauce.
- Much of the remaining stock consisted of accessory foods such as candy, spices, and carbonated and uncarbonated drinks.
- Ineligible items included some hot food, paper goods, health and beauty aids, and clothes.

At the time of the store visit, Appellant informed the FNS contractor that the building is a school for refugees who are its customers.

IV

Each attachment furnished with the charge letter represents the questionable and unusual patterns of SNAP transactions indicative of trafficking which were conducted at the Appellant firm during the review period. As there is more than one pattern of irregular transactions, the case of trafficking becomes more convincing.

**Charge Letter Attachment 1. There were an unusual number of transactions ending in a same cents value.** During the review period, Selam conducted 453 SNAP transactions. Of these, there were 304 transactions in the amount of $9.00 or more; a total of 97 transactions or 31.91% of these transactions ended in 00 cents and 25 transactions or 8.22% ended in 50 cents. When such patterns are unsupported by special pricing structures, they are a strong indicator of trafficking in SNAP benefits.

The following samples from the charge letter attachment illustrate these irregular transaction patterns:

| | Terminal | Date | Time | Household | Amount | Method |
|---|---|---|---|---|---|---|
| Cents Amount: 00 | | | | | | |
| 1 | 03038414 | 09/03/2015 | 11:47:47 AM | *****9781 | 300.00 | Swipe |
| 2 | 03038414 | 09/24/2015 | 09:16:18 AM | *****9600 | 240.00 | Swipe |
| 3 | 03038414 | 10/08/2015 | 05:22:49 PM | *****9781 | 240.00 | Swipe |
| 4 | 03038414 | 09/14/2015 | 06:11:51 PM | *****3047 | 218.00 | Swipe |
| 5 | 03038414 | 10/05/2015 | 11:17:43 AM | *****9781 | 200.00 | Swipe |
| 6 | 03038414 | 10/01/2015 | 09:55:20 AM | *****9600 | 180.00 | Swipe |
| 7 | 03038414 | 10/26/2015 | 04:25:15 PM | *****9163 | 180.00 | Swipe |
| 8 | 03038414 | 09/11/2015 | 01:33:34 PM | *****1444 | 162.00 | Swipe |
| 9 | 03038414 | 10/12/2015 | 09:35:10 AM | *****1867 | 159.00 | Swipe |
| 10 | 03038414 | 09/03/2015 | 11:19:20 AM | *****3953 | 130.00 | Swipe |
| 11 | 03038414 | 09/09/2015 | 06:53:51 PM | *****7215 | 130.00 | Swipe |
| 12 | 03038414 | 09/14/2015 | 04:59:41 PM | *****0157 | 120.00 | Swipe |
| 13 | 03038414 | 10/10/2015 | 02:10:44 PM | *****6565 | 120.00 | Swipe |
| 14 | 03038414 | 10/03/2015 | 04:18:42 PM | *****1569 | 113.00 | Swipe |
| 15 | 03038414 | 10/07/2015 | 05:05:58 PM | *****6214 | 101.00 | Swipe |
| 16 | 03038414 | 10/01/2015 | 03:19:09 PM | *****4457 | 100.00 | Swipe |
| 17 | 03038414 | 10/10/2015 | 01:11:40 PM | *****1782 | 87.00 | Swipe |
| 18 | 03038414 | 09/21/2015 | 06:36:45 PM | *****5587 | 85.00 | Swipe |
| 19 | 03038414 | 09/01/2015 | 03:24:13 PM | *****8000 | 80.00 | Swipe |
| 20 | 03038414 | 09/02/2015 | 11:28:12 AM | *****6063 | 75.00 | Swipe |
| Cents Amount: 50 | | | | | | |
| 98 | 03038414 | 10/01/2015 | 05:19:32 PM | *****0450 | 192.50 | Swipe |
| 99 | 03038414 | 10/07/2015 | 02:23:04 PM | *****5816 | 84.50 | Swipe |
| 100 | 03038414 | 09/11/2015 | 12:50:01 PM | *****6336 | 67.50 | Swipe |
| 101 | 03038414 | 10/12/2015 | 04:49:05 PM | *****0157 | 67.50 | Swipe |
| 102 | 03038414 | 09/02/2015 | 12:16:29 PM | *****6109 | 34.50 | Swipe |
| 103 | 03038414 | 10/03/2015 | 09:55:45 AM | *****1051 | 33.50 | Swipe |
| 104 | 03038414 | 10/03/2015 | 09:59:42 AM | *****1051 | 33.50 | Swipe |
| 105 | 03038414 | 10/06/2015 | 09:29:02 AM | *****6652 | 27.50 | Swipe |
| 106 | 03038414 | 10/01/2015 | 12:19:43 PM | *****6567 | 26.50 | Swipe |
| 107 | 03038414 | 09/10/2015 | 05:08:16 PM | *****1492 | 22.50 | Swipe |
| 108 | 03038414 | 09/16/2015 | 11:58:21 AM | *****1824 | 22.50 | Swipe |
| 109 | 03038414 | 09/23/2015 | 10:38:42 AM | *****0804 | 22.50 | Swipe |
| 110 | 03038414 | 09/17/2015 | 01:41:50 PM | *****7248 | 19.50 | Swipe |

Counsel reports that only 25 of the transactions listed exceed $61.00. Counsel further states that these transaction amounts remain in the realm of average EBT purchases as defined by the Benefits Redemptions Patterns set forth in Exhibit D, which lists the average EBT purchase to be $29.48. The transactions listed in this attachment are not questionable because they are of a certain dollar amount but rather because they end in the same cents value when there is no evidence of a special pricing structure. Consequently, when many transactions end in a same cents amount, it appears that these transaction amounts are contrived and therefore, in the absence of compelling evidence to the contrary, are suggestive of trafficking.

Counsel reports that the prices end in round numbered cents because that is how the store's large items are priced.  Counsel contends that there is no evidence to refute Appellant's position regarding the pricing of the individual items in the store, and as such, should take Appellant's representation as undisputed.  However, given that 60% of the SNAP transactions greater than $9.00 do **not** end in 00 or 50 cents, it is unlikely that there is a specific pricing structure.  The store's inventory contains almost exclusively inexpensive single-serving, food items and accessory foods with the exception of bulk bags of flour and small bags of spices. As such, it is implausible that several of these relatively inexpensive items purchased together would routinely total to an amount ending in 00 and 50 cents.

Based on this empirical data, and in the absence of evidence to legitimize the transactions as being for eligible foods, a conclusion can be drawn, through a preponderance of evidence that the "unusual, irregular, and inexplicable" transactions and patterns cited in the letter of charges evidence trafficking as the most likely explanation.

**Charge Letter Attachment 2:  Excessively large purchase transactions were made from recipient accounts.**  This attachment lists 81 transactions ranging from $45.00 to $300.00, amounts which are at least 300% higher than the average purchase amount for this store type in this state.  These large SNAP transactions total $9,477.94, which is 64% of its total SNAP redemptions during the review period.  These large transaction amounts are not consistent with the store's limited inventory.  There is no meat and the only fresh produce is some bananas.  Therefore, the substantial number of high dollar purchases calls into question the legitimacy of these transactions. The following examples from the charge letter illustrate these irregular transaction patterns:

|     | Terminal | Date | Time | Household | Amount | Method |
|-----|----------|------|------|-----------|--------|--------|
| 123 | 03038414 | 09/03/2015 | 11:47:47 AM | *****9781 | 300.00 | Swipe |
| 124 | 03038414 | 09/24/2015 | 11:39:24 AM | *****9163 | 268.55 | Swipe |
| 125 | 03038414 | 11/23/2015 | 04:29:35 PM | *****9781 | 265.00 | Swipe |
| 126 | 03038414 | 09/15/2015 | 06:24:33 PM | *****1867 | 249.60 | Swipe |
| 127 | 03038414 | 09/24/2015 | 09:16:18 AM | *****9600 | 240.00 | Swipe |
| 128 | 03038414 | 10/08/2015 | 05:22:49 PM | *****9781 | 240.00 | Swipe |
| 129 | 03038414 | 11/18/2015 | 09:25:34 AM | *****9781 | 240.00 | Manual |
| 130 | 03038414 | 11/05/2015 | 05:06:27 PM | *****2870 | 225.00 | Swipe |
| 131 | 03038414 | 09/14/2015 | 06:11:51 PM | *****3047 | 218.00 | Swipe |
| 132 | 03038414 | 10/05/2015 | 11:17:43 AM | *****9781 | 200.00 | Swipe |
| 133 | 03038414 | 10/01/2015 | 05:19:32 PM | *****0450 | 192.50 | Swipe |
| 134 | 03038414 | 09/11/2015 | 05:46:04 PM | *****3126 | 187.08 | Swipe |
| 135 | 03038414 | 10/01/2015 | 09:55:20 AM | *****9600 | 180.00 | Swipe |
| 136 | 03038414 | 10/26/2015 | 04:25:15 PM | *****9163 | 180.00 | Swipe |
| 137 | 03038414 | 11/12/2015 | 11:59:12 AM | *****1867 | 180.00 | Swipe |
| 138 | 03038414 | 11/13/2015 | 02:19:37 PM | *****7248 | 172.00 | Swipe |
| 139 | 03038414 | 10/15/2015 | 11:44:36 AM | *****3310 | 168.92 | Swipe |
| 140 | 03038414 | 10/13/2015 | 11:20:56 AM | *****7148 | 165.85 | Swipe |
| 141 | 03038414 | 09/11/2015 | 01:33:34 PM | *****1444 | 162.00 | Swipe |
| 142 | 03038414 | 10/12/2015 | 09:35:10 AM | *****1867 | 159.00 | Swipe |
| 143 | 03038414 | 11/02/2015 | 11:28:17 AM | *****0450 | 147.50 | Swipe |

Counsel states that it appears that the Department's algorithm simply tagged every single transaction that the store conducted from September 2015 to November 2015. There are 81 transactions listed on this attachment, however Appellant conduced 453 SNAP transactions during the review period. As indicated earlier, the transactions listed are transactions that exceed the store type average by **more than 300%**. These transactions are suspicious because they display characteristics of use inconsistent with the nature and extent of the store's stock and facilities and are therefore indicative of trafficking.

Counsel contends that the largest transaction listed is $300.00 and this is not inherently excessive given the grocery and the nature of New Year celebrations which occur in September for Ethiopia, nor could it be viewed as excessive for the store's type of goods and clientele. There is no evidence to support that the large dollar sales are the result of a September holiday. The total SNAP redemptions were actually lower in September than the rest of the review period.

| Month | Total SNAP Redemptions |
|---|---|
| July 2016 | $5,255.84 |
| August 2016 | $4,412.53 |
| September 2016 | $4,612.62 |
| October 2016 | $4,806.81 |
| November 2016 | $5,096.61 |
| December 2016 | $5,011.25 |

Appellant, through counsel, submitted receipts for large purchase transactions paid with cash for transactions that total amounts of $300.00 and $600.00. Four of the five receipts provided have the name B & G Goods listed as the name of the customer. A company is likely to purchase large amounts of products for resale, however these transactions would not be considered similar to a SNAP recipient with limited resources. Moreover, the record shows that Selam submitted these receipts to the Retailer Operations Division in response to the charge letter to support its stock and indicated that these receipts were for items Selam purchased as part of its inventory. Thus, these receipts do not support that Selam routinely has large transactions.

Counsel reports that Appellant sells eggs, milk, cereal, rice, and noodles in addition to its specialty ethnic food. There were no eggs, rice, or cereal on the day of the store visit nor were there any invoices submitted by Appellant to support that it routinely sells these products. The only dairy products available on the day of the store visit were individual servings of chocolate milk and two packages of butter. There were two boxes of pasta and three one pound bags of pasta. There were also some bowls of noodles and cup of noodles. There was no fresh, frozen or canned meat, poultry, or fish. The only fruit or vegetables were some bananas, canned tomatoes, canned beans, and juice. Appellant did not have an actual counter space to checkout and therefore was unsuitable to process the many eligible SNAP items needed to arrive at the dollar totals listed. Additionally, the store is only approximately 128 square feet. Besides the bulk bags of flour, most foods were single serving size snack foods. That SNAP households would spend large amounts of their limited benefit allotments at Selam strains credulity. In fact on the day of the store visit, Appellant did not meet SNAP authorization criteria as it did not have any items for sale in the meat, poultry, or fish food category and only two varieties in the dairy category (butter and chocolate milk).

9

Counsel argues that there is not a store in Appellant's geographic area that could possibly function as a baseline for comparison. The record does show that Appellant does sell some unique ethnic food items that may be not found at nearby grocers. However, the variety and stock of staple food items are very limited at Appellant and thus does not support a large number of large dollar transactions markedly exceeding the store type average. The Retailer Operations Division determined that the average SNAP transaction at Appellant was $32.92 during the review period, while the average SNAP transaction for combination/other stores in Texas during the review period was $11.24. In fact, Appellant's average SNAP transaction amount during the review period was larger than small, medium, and large groceries as well as combination other stores in Texas as seen in the table herein.

Appellant, through counsel, contends that the area of Selam in which the store operates is more consistently poor than the rest of the country and therefore USDA's expectations for Appellant's transactions should be more in line with what would regularly be seen from a poorer county. However, when compared to the store type average for Harris County, where Appellant is located, Appellant still exceeds each of the different store type averages. Thus, even when compared to stores with a larger selection of more expensive food items including fresh meat, fresh produce, and frozen food items, Appellant's average SNAP transaction still exceed all these other store types.

| Store Type | State Average SNAP Transaction During Review Period | County Average SNAP Transaction During Review Period |
|---|---|---|
| Selam | $32.92 | $32.92 |
| Combination/Other | $11.24 | $11.46 |
| Small Grocery | $14.54 | $20.62 |
| Medium Grocery | $19.14 | $21.20 |
| Large Grocery | $22.87 | $23.14 |

The Retailer Operations Division also determined that Appellant had total SNAP redemptions of $14,914.67during the review period. This amount was greater than the average SNAP redemptions for a Texas combination/other store during the same period, which was $12,089.51. Yet, Appellant conducted just 453 SNAP transactions during the review which is less than the half the average amount of SNAP transactions conducted by combination other stores in Texas during the review period. When compared to combination/other stores in Texas, Appellant still exceeds the state average and most of the stores would have a much larger variety of staple foods including dairy, produce, and meat that would justify higher dollar transactions. Appellant did not provide a credible explanation for the volume of high dollar transactions given the sparse stock of staple foods including specialty ethnic foods.

Appellant submitted invoices to the Retailer Operations Division in reply to the charge letter to show that the store carried sufficient product to support the level of SNAP activity. Counsel provided a smaller selection of these invoices in Exhibit A. The Retailer Operations Division completed an analysis of the invoices and determined that Appellant did not purchase the stock to support its SNAP redemptions. Invoices that were for outside of the review period were excluded. Considering a 40% markup, Selam had SNAP redemptions higher than possible SNAP transaction amounts. Cash and credit transactions would also have to be considered as SNAP could not reasonably be the only payment source. Moreover, counsel inferred that there were several large

cash transactions for ethnic food items (counsel's Exhibit E). Although, as indicated earlier, the documentation to support these large cash transactions was not accurate. In sum, as seen on the table herein, Appellant's inventory purchased during the review period does not support the store's monthly sales.

| Month | September 2016 | October 2016 | November 2016 | Total |
|---|---|---|---|---|
| Invoices | $1,775.00 | $246.30 | $1930.00 | $3,951.30 |
| Total with 40% Mark-up | $2,485.00 | $344.82 | $2,702.00 | $5,531.82 |
| SNAP Redemptions | $4,806.81 | $5,096.61 | $5,011.25 | $14,914.67 |

Counsel explains that Appellant's customers have a habit of purchasing all of the store's stock upon arrival at the store to ensure that they will not run short of their supply for cooking. However, if this was true there would be more invoices for the purchase of Teff to keep up with the alleged demand. This statement was not supported by the evidence provided to the Retailer Operations Division by way of invoices. Counsel also contends that Appellant should not be compared to other stores because there are no other stores that sell to this customer base "in such a significant volume." Again, that Appellant sells a "significant volume" of ethnic specialty products is not supported by the evidence presented to the Retailer Operations Division. Counsel further states that Appellant's stock was piled from the floor to the ceiling. This stockpile of food is not visible in the photographs taken on the day of the store visit or described in the inventory report completed on the day of the store visit. Counsel provided photos of its food inventory as evidence. However, the photos provided by the Appellant are not significantly different from the photos taken during the earlier store visit and do **not** evidence a significant stock of eligible food items.

Sometimes a firm may have higher than normal SNAP transactions amounts due to a recipient's lack of access to other SNAP authorized stores. However, the Retailer Operations Division determined that there are 49 authorized stores located within a one-mile radius of Appellant and there are five super stores and four supermarkets located within a two-mile radius. The Retailer Operations Division conducted a shopping analysis of three of the households with transactions identified in the charge letter. These households exhibited similar suspicious transaction patterns. For example, Household *9781 received $3,066.00 in SNAP benefits during the review period and transacted $1,245.00 at Appellant during the three month review period. Given the inventory at Appellant during the review period, it is unclear what eligible food items the household was purchasing. This would be 60 bags of Teff flour. This household also shopped at six other super stores and one halal meat market during the review period where it transacted most of its benefits.

In summary, the store's layout, business structure, and food inventory do not support a high percentage of transactions markedly exceeding the average SNAP transaction amount of similar type stores. Government analyses of stores caught in trafficking violations during on-site investigations have found that transactions involving trafficking consistently display particular characteristics or patterns. These patterns include, in part, those cited in the letter of charges. Therefore, based on this empirical data, and in the absence of evidence to legitimize such transaction patterns, a conclusion can be drawn, through a preponderance of evidence that the "unusual, irregular, and inexplicable" transactions and patterns cited in the letter of charges evidence trafficking as the most likely explanation.

## V

Counsel contends that Appellant should be considered a specialty food store for purposes of evaluating the transaction amounts and frequency instead of a small grocer. The records shows that the firm was initially authorized as a combination store based on the information provided on its SNAP application for authorization, the store visit report and store visit photographs. The store type was changed in January 2016 from a combination store to a small grocery due to the firm's application for reauthorization that indicated 80% of the firm's gross sales were from staple foods. This application indicated that it carried three varieties in each of the four staple food categories. A specialty store is a firm which more than 50% of its gross sales come from the sales of staple food items and it sells primarily one category (possibly two or three) of food such as meat, seafood, bakery, or produce. A review of this information does not support that Appellant should be considered a specialty store.

As to the court case cited by counsel, Brooklyn Mini Market vs. U.S. Case No. 12-CV-6708T (2014), the administrative review process is to determine whether FNS followed the Food and Nutrition Act and the regulations issued under the Act when it took action against the retailer. The administrative review officer is not responsible for determining whether any court cases cited by counsel apply to Appellant's situation. If this final agency decision is appealed to the federal district court, the judge is responsible for determining whether the court cases cited by counsel are on point and applicable to the case presently under review.

Counsel contends that the absence of transactions occurring too close together or that the households benefits were drained indicate that the transactions occurring at the location are legitimate in nature and do not amount to trafficking. However, the fact that Appellant is not charged with a particular trafficking pattern does not establish that the firm is not trafficking.

## VI

Counsel contends that Appellant's geographic area has an approximately 40.7% poverty rate, the vast majority of which is located in the geographic area immediately surrounding Appellant. Counsel also reports that approximately 87.1% of the local population receives SNAP benefits, with 225 of which are households with one or more people who are 60 years or older and 65.1% with children under the age of 18. Regarding this contention, some degree of inconvenience to SNAP customers is inherent whenever any SNAP authorized retailer is disqualified. When there is a hardship to SNAP households, FNS may impose a hardship CMP on a firm in lieu of a disqualification where there is a lack of authorized stores in the area. However, the regulations at 7 CFR §278.6(f)(1) clearly state that "a civil money penalty for hardship to [SNAP] households may not be imposed in lieu of a permanent disqualification." Because the Retailer Operations Division has taken action to permanently disqualify Appellant's firm, a hardship CMP in lieu of disqualification cannot be granted.

Counsel states that there is no evidence of trafficking. 7 CFR §278.6(a), noted herein, establishes the authority upon which FNS may disqualify an authorized retail food store on the basis of evidence obtained through a transaction report under an EBT system. The record reflects that Appellant's firm was chosen for analytical investigation based upon numerous detailed and rigorous

mathematical algorithms applied not only to Appellant's firm but to all SNAP authorized firms, including all firms of a like type in the state of Texas. The data analyzed includes numerous comparisons of information such as the average SNAP transaction amount which as indicated previously was $32.92 during the analysis period, almost three times the average total SNAP redemption amount for similar type stores in the State during the same period. This and other data presented the Retailer Operations Division with a statistically valid prima facie indication of unusual transaction activity; the activity therein identified is not marginally irregular, but markedly so.

Properly analyzed and interpreted, the Retailer Operations Division does not contend that the EBT transactions detailed in its charge letter are overtly suspicious when they occur on an occasional or intermittent basis, but when such transactions form repetitive patterns on a comparative basis over periods of time such activity is identified for further analysis. Once such firms have been identified as potential compliance cases, from more than 200,000 authorized firms nationwide, the Retailer Operations Division undertakes a detailed examination of the available transaction data and obtains further relevant information regarding the firm's business operations, such as the level and condition of staple food stock maintained by the firm, the firm's logistics, physical layout, and store characteristics and numerous other factors pertinent to the firm's ability to legitimately process the transaction activity at issue. Agency policy and procedures direct that only after a careful, comprehensive and complete analysis, from which appropriate conclusions are logically derived, will the firm be issued a charge letter. The firm is then given the opportunity to reply to those charges and provide any information it deems appropriate to justify the transaction activity detailed in the charge letter. In the present case, these policies and procedures are shown by the record to have been duly performed in all relevant and appropriate detail.

Moreover, as noted, the regulations at 7 CFR §278.6(a) state that FNS may disqualify any authorized retail food store on the basis of evidence obtained through a transaction report under an EBT system. Consequently, transaction data as a basis for the charges at issue is as valid as evidence obtained through an undercover investigation. Accordingly, the case against the firm is not reflected by the record to lack evidentiary value, but rather to be comprehensive, analytic, logically derived and specific in its charges of SNAP benefit trafficking, an egregious violation of the Act, regulations and agency policy.

Furthermore, the transaction data is indeed factual, the existence and accuracy of which is not in dispute; redundant systems confirm numerous data points for each transaction including the date, time, store authorization number, terminal ID, amount transacted, remaining balance and other particulars. As previously noted, Appellant bears the burden of demonstrating by a preponderance of the evidence that the administrative actions should be reversed. Appellant must provide a preponderance of evidence that the transactions detailed in the charge letter were more likely than not due to the legitimate sale of eligible food in exchange for SNAP benefits. In the absence of compelling information or documentation weighed in comparison to the evidence provided by the Retailer Operations Division the evidence weighs in favor of the Retailer Operations Division's determination that SNAP-benefit trafficking substantially produced the transaction activity at issue in the present case.

# VII

In the charge letter, the Retailer Operations Division informed Appellant of its right to request a trafficking CMP under 7 CFR §278.6(i). Appellant was informed that it would need to provide both the request and supporting evidence within ten calendar days of receiving the charge letter and that no extension of time could be granted for making the request or for providing the required evidence.

The criteria for a trafficking CMP in lieu of disqualification is defined under 7 CFR §278.6(i) which reads, inter alia:

> *In determining the minimum standards of eligibility of a firm for a civil money penalty in lieu of a permanent disqualification for trafficking, the firm shall, at a minimum, establish by **substantial evidence** [emphasis added] its fulfillment of each of the following criteria:*
>
> *Criterion 1. The firm shall have developed an effective compliance policy as specified in §278.6(i)(1); and*
>
> *Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and*
>
> *Criterion 3. The firm had developed and instituted an effective personnel training program as specified in §278.6(i)(2); and*
>
> *Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm ....*

Appellant did not request consideration for a trafficking CMP in lieu of a permanent disqualification under 7 CFR 278.6(i), even though it was informed of the right to do so in the charge letter. In the administrative review request Appellant, through counsel, contends that each employee has been trained to implement the SNAP program and accept EBT payments since the store started accepting EBT payments. Counsel explains that the training included a disclosure of the store's policy regarding violations of the EBT regulations, and a complete guide for what transactions were permissible, what items were eligible, and how and when payments could be accepted. This is not the type of <u>substantial</u> evidence necessary to establish that the firm had an effective personnel training program in place prior to the violations. Thus, even if a timely request had been submitted, Appellant would likely not have been eligible for a trafficking CMP in lieu of disqualification because there is insufficient evidence to demonstrate that the firm had established and implemented an effective SNAP compliance policy and program prior to the violations.

In conclusion, Appellant did not timely request a trafficking CMP and the Retailer Operations Division's decision not to impose a trafficking CMP in lieu of a permanent disqualification is sustained as appropriate pursuant to 7 CFR §278.6(i).

14

## CONCLUSION

The Retailer Operations Division's analysis of the firm's EBT transaction record was the primary basis for its determination to permanently disqualify Appellant. This data provided substantial evidence that the questionable transactions during the review period had characteristics that are consistent with trafficking violations in SNAP benefits. Therefore, based on a review of all of the evidence in this case, it is more likely true than not true that program violations did occur as charged by the Retailer Operations Division. Based on the discussion herein, the determination to impose a permanent disqualification against Appellant is sustained.

## RIGHTS AND REMEDIES

Applicable rights to a judicial review of this decision are set forth in 7 USC §2023 and 7 CFR §279.7. If a judicial review is desired, the Complaint, naming the United States as the defendant, must be filed in the U.S. District Court for the district in which the Appellant's owners reside or are engaged in business, or in any court of record of the State having competent jurisdiction. If any Complaint is filed, it must be filed within thirty (30) days of receipt of this Decision.

Under the Freedom of Information Act (FOIA), it may be necessary to release this document and related correspondence and records upon request. If we receive such a request, we will seek to protect, to the extent provided by law, personal information that if released, could constitute an unwarranted invasion of privacy.


_Mary Kate Karagiorgos_                                June 17, 2016
MARY KATE KARAGIORGOS                                  DATE
ADMINISTRATIVE REVIEW OFFICER

15

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
LUUL YIKALO TIKABO, an Individual; and
SELAM GROCERY, a Sole Proprietorship

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Andrew Z. Tapp, Esq., 100 S. Ashley Drive, Suite 1780, Tampa, Florida 33602 - Telephone: (813) 228-0658

## DEFENDANTS
UNITED STATES OF AMERICA

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

16-2197

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*  *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☒ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
7 USC Section 2023 and 7 CFR Section 278.6
Brief description of cause:
Disqualification from SNAP

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  7/21/16

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____